```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                         CLASS ACTION
              CIVIL ACTION NO. 2:17-cv-3118-MAK

RENEISHA KNIGHT, on behalf of  )  DEPOSITION UPON
HERSELF AND ALL OTHER          )
SIMILARLY SITUATED CONSUMERS,  )
                               )  ORAL EXAMINATION
                               )
         Plaintiff,            )       OF
                               )
    - vs -                     )
                               )
MIDLAND CREDIT MANAGEMENT, INC.)  RENEISHA L. KNIGHT
                               )
         Defendant.            )
- - - - - - - - - - - - - - - - -
```

            TRANSCRIPT OF DEPOSITION, taken by
and before KAREN M. BOMPADRE, Professional Reporter
and Notary Public, at MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN, P.C., 2000 Market Street, Suite
2300, Philadelphia, Pennsylvania  19146, on Friday,
February 8, 2019, commencing at 11:15 a.m.


                    ERSA COURT REPORTERS
                    30 South 17th Street
                  United Plaza - Suite 1520
                 Philadelphia, Pennsylvania 19103
                       (215) 564-1233

## Page 2

APPEARANCES:

THE ZEMEL LAW FIRM
BY: DANIEL ZEMEL, ESQUIRE
1373 Broad Street
Suite 203C
Clifton, New Jersey  07013
    Counsel for the Plaintiff

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN, P.C.
BY: ANDREW M. SCHWARTZ, ESQUIRE
2000 Market Street
Suite 2300
Philadelphia, Pennsylvania  19146
    Counsel for the Defendant

---

## Page 3

I N D E X

WITNESS                                  PAGE
RENEISHA L. KNIGHT
  By: Mr. Schwartz                         4

---

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE MARKED | PAGE ATTACHED |
|---|---|---|---|
| P-1 | Amended Notice of Deposition | 7 | 105 |
| P-2 | 3/24/17 Letter | 34 | 106 |
| P-3 | 5/12/17 Letter | 34 | 107 |
| P-4 | Letter | 45 | 108 |
| P-5 | Document | 51 | 109 |
| P-6 | Document | 59 | 110 |
| P-7 | Original Complaint | 64 | 111 |
| P-8 | First Amended Complaint | 68 | 112 |
| P-9 | Second Amended Complaint | 70 | 113 |
| P-10 | Document | 87 | 114 |
| P-11 | Document | 93 | 115 |
| (No Exhibit 12) | | | |
| P-13 | Document | 96 | 116 |
| P-14 | Document | 98 | 117 |

---

## Page 4

(By agreement of counsel, the sealing, filing, and certification of the transcript have been waived; and all objections, except as to the form of the question, have been reserved until the time of trial.)

- - -

RENEISHA L. KNIGHT, after having been duly sworn, was examined and testified as follows:

- - -

BY MR. SCHWARTZ:

Q   Good morning, Ms. Knight.

A   Yes.

Q   Good morning, Ms. Knight. My name is Andrew Schwartz, and I represent the defendant in this matter, Midland Credit Management in the lawsuit brought by you, on behalf of yourself and a class of individuals in the Eastern District of Pennsylvania. Good morning.

A   Good morning.

Q   So have you ever been deposed before?

A   No.

Q   So I'm going to give you some instructions

## Page 5

before we start that process, I think. You've been placed under oath?

A   Yes.

Q   So when I ask you a question, I expect you to give me an answer that's truthful. And that doesn't mean you have to guess. If you don't know, the answer is I don't know. But if you do know, I expect the answer to be truthful and as accurate as you can be. Do you understand that?

A   I understand.

Q   We have a court reporter Karen. She is taking down everything that I say, as well as what you say. So we can't talk at the same time. Do you understand that?

A   I do.

Q   Okay. Additionally, I ask that when I ask you a question, you wait until I complete it, because sometimes I go on and on. And I don't want you to answer a question that's not responsive. I just want you to give the right answer. Do you understand that?

A   I do.

Q   When I ask you a question, I ask that you pause, if you can, to allow your attorney to assert

26

1  Q      You were dealing with him for about a
2  month?
3  A      Yes.
4  Q      Was it helpful in any way?
5  A      No. I think that's probably why it didn't
6  go anywhere.
7  Q      Okay. How did you come to know Coulter
8  Credit Counseling?
9  A      Through a Realtor that I was referred to.
10 Q      Do you know the name of that Realtor?
11 A      I do.
12 Q      Okay.
13 A      Rowan Acquisitions. That's the name of his
14 company. His name is Mr. Powell.
15 Q      Do you recall about when that, when you
16 went or you -- why don't you tell me how you first
17 met with Mr. Coulter.
18 A      Okay. Well, after a couple of meetings
19 with Mr. Powell, the Realtor, he put me in contact
20 with Mr. Coulter, because there were some issues,
21 some concerns on my credit report.
22 Q      Okay. And aside from your concerns with
23 Midland, were there other concerns?
24          MR. ZEMEL: Objection to form.

27

1          Go ahead.
2  BY MR. SCHWARTZ:
3  Q      I can say, what were your concerns?
4  A      My concerns were things that was being
5  reported on my report that some of them that I
6  didn't know of, and, ultimately, trying to fix my
7  credit.
8  Q      Now, again, beyond my client, do you recall
9  if there were any other issues on your credit report
10 that caused you that concern?
11 A      Yes.
12 Q      Okay. Do you recall, can you remember who
13 those individuals were or entities?
14 A      Not every last one of them, but I could say
15 one was my student loan. It was, the Midland was
16 one year, I think, a couple of times. I would
17 probably say those were probably my biggest, yes.
18 Q      Why were you meeting with a real estate
19 agent at the time -- and we'll get to the time --
20 but why were you meeting with him?
21 A      Major separation, which, you know,
22 ultimately, I kind of knew that was leading to
23 divorce. And I originally went for rental
24 properties.

28

1  Q      Okay.
2  A      Then we just started engaging in
3  conversation about ownership and stuff like that.
4  Q      Now, do you know when that was?
5  A      Approximately, probably my first meeting
6  with him was in 2015.
7  Q      When you say him?
8  A      Mr. Powell.
9  Q      That was your first meeting. What was your
10 first meeting with Coulter Credit Counseling?
11 A      My very first real meeting, maybe I want to
12 say somewhere maybe the beginning of 2000 -- maybe
13 the end of 2015.
14 Q      Okay.
15 A      Yes.
16 Q      Now, I mentioned Coulter Credit Counseling.
17 Did you meet with Ramsey Coulter?
18 A      Yes.
19 Q      Where did you meet him?
20 A      At Rowan Acquisitions Offices. He has an
21 office there.
22 Q      Was that your first meeting with
23 Mr. Coulter?
24 A      Yes.

29

1  Q      Tell me a little bit about the meeting.
2  What happened?
3  A      Okay. So we went over the basics, got a
4  little background, pretty much as what you did. I
5  don't think he pulled my credit report right then
6  and there. I actually had to do the pulling. I
7  pulled my own credit report. And I forwarded him
8  the information. And then we set up to meet again.
9  So our very first visit was very basic and simple,
10 going over what he does and, basically, what I need
11 to look forward to.
12 Q      Okay. When you said you forwarded it, was
13 it by email? Did you mail it to him? Did you hand
14 it to him?
15 A      No -- well, I probably handed it to him,
16 because I met with him again.
17 Q      Okay.
18 A      And we physically went over it.
19 Q      When you met him the second time, was it at
20 the Rowan Offices?
21 A      Yes. That's the only place I've ever met
22 him.
23 Q      Do you know about when that second meeting
24 took place?

34

1  2017?
2  A     Possibly.
3         MR. SCHWARTZ: Why don't we get
4     this marked.
5         (Documents marked as Exhibits
6     P-2 and P-3 are marked for identification.)
7  BY MR. SCHWARTZ:
8  Q     The reporter has handed you two exhibits
9  marked P-2 and P-3 in front of you. Can you tell me
10 what these are?
11 A     They look familiar. I think these are --
12 they look familiar. I believe -- oh, yes. So we
13 sent out letters to Midland disputing the account.
14 And some were returned without any, basically, I
15 guess progress. Then we would have to send out
16 another notice.
17 Q     Taking a look --
18 A     A letter, actually.
19 Q     I'm sorry. I didn't mean to cut you off.
20 Looking at -- I hope I did this in the right order.
21 Looking at Exhibit P-2, okay?
22 A     Yes.
23 Q     That letter, am I correct that letter is
24 dated March 24th, 2017?

35

1  A     Yes.
2  Q     When you say we, who drafted this letter?
3  A     Mr. Coulter.
4  Q     So Mr. Coulter drafted this letter. And
5  you see it's dated 3/24/2017.
6  A     Yes.
7  Q     Is it safe to say that you were still using
8  Coulter Credit Counseling in March of 2017?
9  A     Yes. Again, it was just -- it was on and
10 off.
11 Q     Okay. When you used him for this letter,
12 did you have any role in drafting the letter?
13 A     No.
14 Q     So he didn't come to you and say this is
15 what we're going to do; he just sent you a letter
16 and said -- well, why don't you tell me. How did
17 this letter come to me?
18 A     So we went over the account, I guess we
19 went over the issues with the account. And he
20 always sent this to me -- anything he sent out, we
21 went over prior to him sending out.
22 Q     I just want to draw your attention to, it's
23 the last paragraph -- not the last paragraph, the
24 first paragraph on the second page. It says also

36

1  adding interest and fees that are not expressly
2  allowed (written) in the original contract is a
3  violation of the 15 USC 1692 F (1), which you have
4  done presumably illegally. Is it your belief that
5  Midland Credit Management added interest to your
6  debts at any time, do you know?
7  A     So if I'm understanding you correctly, the
8  debt that is owed, I did have consolation to. I
9  felt as though that was incorrect, the amount that
10 was owed, that Midland stated that was owed.
11 Q     Okay. So this letter, he would have,
12 Mr. Coulter would have sent this to you via email
13 and you would have looked at it?
14 A     No. Most of the time with these -- you
15 know what, no. There were probably a few times that
16 he sent this via email. There were a few times I
17 had to go in for drop-offs and he was there and then
18 we went over some things.
19 Q     Do you have any idea what the FDCPA is? I
20 want to go through the other letters that are down
21 in the last sentence.
22 A     I don't know what it stands for, no, I do
23 not.
24 Q     What do you believe it is?

37

1  A     I would presume that it's a law that, it's
2  in place to basically kind of shield consumers from
3  creditors in unfair acts that they do.
4  Q     Okay. With respect to the FCRA, do you
5  know what that is?
6  A     I do not -- Fair Credit Reporting Act, yes,
7  I do, yes.
8  Q     And the --
9  A     Sorry.
10 Q     What about the TCPA?
11 A     I'm not sure if that's a Trade Commission
12 one. I'm not going to presume, so no. I'm not
13 going to presume.
14 Q     That's fine. I'm not asking you to presume
15 or guess.
16 A     Okay.
17 Q     I want you to take a look at the Exhibit
18 P-3. It's the May 12th, 2017 letter that's from you
19 to Midland Credit Management. Do you see that?
20 A     Uh-huh.
21 Q     Now, it says here, I have just -- to make
22 sure I'm reading it correctly -- I have already
23 disputed this account with the credit bureaus.
24 Explain to me how you disputed the account with the

### Page 38

1  credit bureaus.
2  A     Well, it actually mentions it from the
3  same, from the first letter.
4  Q     I can ask you about the first letter or
5  this one.  It doesn't matter.
6  A     Okay.
7  Q     How did you dispute information to the
8  credit bureaus?
9  A     I don't think I understand exactly what
10 you're saying.
11 Q     Okay.  So did you dispute these accounts
12 identified in either letter with TransUnion,
13 Experian or Equifax?
14 A     Yes.
15 Q     So you personally did that or Mr. Coulter
16 did that?
17 A     I think in combination we did it, but I do
18 recall doing it, yes.
19 Q     Do you recall how you did that?
20 A     On-line.
21 Q     So you made an on-line dispute to Experian,
22 TransUnion.  You did it on-line.  Was this in his --
23 were you meeting with him at the time that you did
24 this?  I'm trying to figure out you did something

### Page 39

1  together on the Internet.
2  A     I'm not exactly sure if I -- no, I don't
3  know if I did it in his presence, but we have done
4  things together on-line that needed to be done.  And
5  he has walked me through a few things, via
6  telephone.
7  Q     Okay.
8  A     Conference calls and different things of
9  that sort.
10 Q     Okay.  So now, turning your attention back
11 to P-3, which is the May 12th, 2017 letter, you
12 provide that you provided on March 24, 2017, you
13 sent a letter requesting validation or that the
14 collection that you are erroneously reporting
15 against may be removed from my credit report.
16        Did I read that accurately, more or less?
17 A     Yes.
18 Q     So did you receive, do you recall receiving
19 a response from Midland Credit Management with
20 respect to your request for validation?
21 A     I am not certain.
22 Q     So it says I received your response; it is
23 not acceptable.  Do you know where that's —
24 A     That's coming from this one.  We did

### Page 40

1  receive a response from the first letter.
2  Q     Okay.
3  A     And then in turn it was not acceptable and
4  then we did the second letter.
5  Q     Do you know why it wasn't acceptable to
6  you?
7  A     It wasn't addressing any of the concerns in
8  the first letter.
9  Q     Do you know what they provided you?
10 A     I can't say exactly what was in the letter.
11 It's been, you know, sometime, but I do recall
12 meeting actually in-person with Mr. Coulter
13 regarding that.
14 Q     Okay.
15 A     Before they drafted the second letter.
16 Q     But you recall you made on-line disputes to
17 the credit bureaus themselves?
18 A     Yes.
19 Q     Do you recall receiving a response from the
20 credit bureaus?
21 A     I remember receiving confirmation that they
22 received, I guess, my dispute, and that they were
23 looking into it.
24 Q     Okay.

### Page 41

1  A     I can't honestly say anything past that.  I
2  don't remember.
3  Q     Do you know if those documents were
4  provided to your attorney --
5  A     I don't know.
6  Q     -- Mr. Zemel, sorry?
7  A     I don't know.
8  Q     Do you know why they haven't been produced
9  in the course of discovery in this case?
10 A     I don't know.
11 Q     Let me step back real fast.  In the May
12 12th, 2017 letter, which was P-3, where it says,
13 you're saying that it says — when you're talking
14 about the verification provided by Midland or the
15 validation, you're saying it is vague and does not
16 constitute any form of validation according to the
17 FDCPA.
18        Is that your words?  Do you see in the
19 middle of the second paragraph, or is that
20 Mr. Coulter's words?
21 A     That's his job to know more about the
22 FDCPA, but it is my response that that was
23 unacceptable.
24 Q     Okay.  Now, eventually Coulter, when you

Page 42

1  met with Coulter Credit, did they ask you to produce
2  every collection letter you've received?
3  A    Yes.
4  Q    And was one of those collection letters the
5  July letter that is at issue in this case?
6  A    More than likely, yes.
7  Q    How did you come to know Mr. Zemel?
8  A    Through Mr. Coulter.
9  Q    So Mr. Coulter, just to make sure that I
10 understand, asked you for letters that you received
11 from debt collectors; is that an accurate statement?
12 A    Yes.
13 Q    Okay.
14 A    He asked me -- yes. I submitted quite a
15 few.
16 Q    When you say quite a few, that wasn't just
17 limited -- was that do you recall from Midland how
18 many letters you sent him?
19 A    No, I don't recall the number, but it was
20 more than one.
21 Q    It was more than one?
22 A    Yes.
23 Q    Did you provide him with any other letters
24 from any other debt collectors or creditors at that

Page 43

1  time?
2  A    Yes. I did. I don't know if they were
3  debt collectors. They were just collection letters
4  from like medical bills and stuff like that.
5  Q    You sent those letters. When was the first
6  time that Mr. Coulter referenced your Attorney Zemel
7  to you?
8  A    I can't recall the first time, but I do
9  recall a meeting where he was very concerned of, I
10 guess, of reviewing some of the letters I gave him;
11 he had a concern for a few.
12 Q    Do you recall with respect to the -- I'll
13 get to it, okay -- do you recall what Mr. Coulter
14 said -- let me ask you this: When you received the
15 letters from Midland, other than the interest issue
16 or you didn't think you owed the amount, what was
17 the basis of your concern with the Midland
18 collections, where they were trying to collect debts
19 on you? Was it that you -- I'll give you examples
20 -- was it debt that you didn't owe it at all? Was
21 it that you thought the amount was wrong? What was
22 it?
23 A    Well, in receiving the letters, quite a few
24 things. It was kind of off, yes, one, the balance.

Page 44

1  Q    Okay.
2  A    That was produced in the letter. Reading
3  the letter, you know, I was going over with
4  Mr. Coulter some confusing, just things on the
5  letters.
6  Q    We'll get to that. Okay. When was the
7  first time that you spoke with Mr. Zemel or anybody
8  -- when I say Mr. Zemel, by the way, I mean Zemel
9  Law, his office?
10 A    Yes.
11 Q    When was the first time you spoke with
12 Zemel Law Offices?
13 A    It's been a couple years.
14 Q    Well, let me ask you this: I'll try to
15 hone in on it a little bit. So you started using
16 Coulter in?
17 A    Around 2016
18 Q    Right. Late, December of 2015, beginning
19 January of 2016 --
20 A    My first, yes.
21 Q    Okay. In that period of time, the late
22 2015/2016, did Mr. Coulter introduce you to the Law
23 Offices of Zemel Law Offices?
24 A    Not immediately.

Page 45

1  Q    Was it before you sent these, the two
2  letters marked, was it March of 2017, May of 2017?
3  Was it before those letters were sent out that you
4  first met with somebody or contacted somebody with
5  Zemel Law Office?
6  A    I can't really say if it was before, but it
7  was within that same time period of when the letters
8  were going out.
9           MR. SCHWARTZ: Let's mark P-4.
10          (Document marked as Exhibit P-4
11     is marked for identification.)
12 BY MR. SCHWARTZ:
13 Q    I've handed over to you, the court reporter
14 has handed over to you a letter from Midland Credit
15 Management dated August 24, 2015. And it's directed
16 to Reneisha L. Branch, correct?
17 A    Uh-huh -- yes.
18 Q    Now, the address on that letter, in August
19 of 2015, was that the address that you resided?
20 A    The numbers are incorrect, but the street
21 is correct.
22 Q    Okay. So it wasn't 547?
23 A    No.
24 Q    What was the address?

Page 50

1  pay the debt, you didn't have any intention of
2  paying the debt?
3  A     No, I couldn't at that time.
4  Q     Could you today?
5  A     Is that a question? I really don't know.
6  Q     Is it your intent to pay this debt,
7  assuming Midland doesn't cancel it, is it your
8  intent to pay this debt?
9  A     After some information that I, you know,
10 reviewed with them, Coulter, Mr. Coulter, no.
11 Q     When you reviewed that with Mr. Coulter,
12 are you talking about from the inception, so when
13 you first met with him -- I'm just trying to figure
14 out a time frame. So in December of 2015, when you
15 first met with him going into January of 2016, at
16 what point did you speak with him and say I'm not
17 going to pay this?
18 A     There were numerous conversations, over the
19 course of a period, where it was being known that
20 certain debt to pay it off, it will actually hurt
21 me, rather than help me.
22 Q     Okay. Would you say that those
23 conversations took place before July 20th, 2016, to
24 the best of your recollection?

Page 51

1  A     You said -- what was the date?
2  Q     July 20th, 2016, so it would have been
3  within the --
4  A     Yes, yes, safe to say we've had
5  conversations prior to that probably.
6            MR. SCHWARTZ: Let's get this
7        marked P-5.
8            (Document marked as Exhibit P-5
9        is marked for identification.)
10 BY MR. SCHWARTZ:
11 Q     Now, I'm turning your attention to Exhibit
12 P-5. It's identified, the person who sent this was
13 Reneisha L. Branch.
14 A     Uh-huh.
15 Q     You said earlier your middle name was
16 Latoya, correct?
17 A     Yes.
18 Q     So would you understand that to mean
19 Reneisha Latoya Branch?
20 A     Yes.
21 Q     The address is blocked out, and I don't
22 have a copy. Do you recall what address this was
23 sent to in July 20th, 2016, what address it would
24 have been sent to?

Page 52

1      Let me ask you a better question. Where
2  were you living on July 20th, 2016, what address?
3  A     It depends on what time of the year. It
4  was two addresses in that year.
5  Q     Okay. Which two?
6  A     836 Marlyn Road and 607 Wynnewood Road.
7  Q     Do you recall when you received this
8  letter?
9  A     I don't.
10 Q     But, of course, it would be after July
11 20th, 2016?
12 A     Uh-huh.
13 Q     Is that correct?
14 A     I would assume, yes.
15 Q     I think it's safe to say?
16 A     Yes.
17 Q     Do you recall when you received this
18 letter, did you read it?
19 A     Of course, yes.
20 Q     Did you read it after you sent it to
21 Mr. Coulter?
22 A     No.
23 Q     And you had conversations, or you read it
24 before?

Page 53

1  A     I read it before.
2  Q     On July 20th, 2016, did you already -- were
3  you already in contact with the Zemel Law Firm?
4  A     Yes.
5  Q     Why were you in contact with them at that
6  point?
7  A     Again, I was going over some credit issues
8  that I had, so I was put in contact with them by
9  Mr. Powell.
10 Q     I'm sorry, Mr. Powell?
11 A     Yes.
12 Q     Or Mr. Coulter?
13 A     Mr. Powell put me in contact with
14 Mr. Coulter.
15 Q     Okay. I'm talking about Mr. Zemel Law
16 Office.
17 A     Oh, I'm sorry. I apologize.
18 Q     Okay.
19 A     So let's start over again.
20 Q     Sure. At the time you received this July
21 20th, 2016 letter, were you in communication or
22 contact with the Zemel Law Office?
23 A     Okay, I believe so.
24 Q     Why? And I don't want to know any

54

1  conversations you had with the Zemel Law Firm.
2  A     Right.
3  Q     Before you received this letter --
4  A     I know I spoke with Mr. Coulter about
5  Mr. Zemel.  Now, to say if I had an actual
6  conversation with his office prior to then, I'm not
7  exactly sure, but I knew of Mr. Zemel, yes.
8  Q     Did you sign a retainer agreement with
9  Zemel Law Office to represent you?
10 A     Oh, yes.
11 Q     Excuse me?
12 A     Yes.
13 Q     Do you recall when that was?
14 A     No.
15 Q     Is it possible that you signed a retainer
16 agreement with the Zemel Law Firm before July 20th,
17 2016?
18 A     I couldn't tell you that.  I don't know.
19 Q     I guess what I'm trying to get at here is,
20 do you understand what the Zemel Law Firm does, what
21 their purpose is with respect to consumer
22 protection?  Do you understand what they do?
23 A     Yes.
24 Q     What do they do?

55

1  A     So when you say consumer protection, what
2  are you implying with that?
3  Q     I don't know whether Zemel Law does
4  personal injury work, but I'm talking about consumer
5  protection pursing FDCPA claims, FCRA claims and
6  TCPA claims.
7  A     Well, that's about all that I know they do.
8  I'm not sure if they do anything else.
9  Q     That's all I knew too; regardless, what I'm
10 trying to figure out is, this letter is the subject
11 matter of a lawsuit that we're in right now,
12 correct?
13 A     Yes.
14 Q     I'm trying to figure out if you retained
15 the Zemel Law Firm before this letter, I'm trying to
16 figure out why?
17 A     They represented me before in another case.
18 So —
19 Q     Let me stop you at that point.  What other
20 case?
21 A     It was against Midland, but it was a
22 different creditor, I guess you would say.  It
23 wasn't Capital One.  It was, maybe GE, I think it's
24 called.

56

1  Q     So you're saying that the lawsuit that was
2  filed after this lawsuit — I'm not sure I'm
3  understanding.  There was a lawsuit involving you
4  with Midland that was filed after this lawsuit.
5  A     Okay.
6  Q     This lawsuit concerned this letter.  I'm
7  just trying to figure out whether you retained the
8  Zemel Law Firm in the hopes of finding a lawsuit, or
9  because of this letter, which is the subject of this
10 lawsuit?
11 A     No.  He was retained because of the letter.
12 Q     So your retention would have been after
13 July 20th, 2016?
14 A     Yes.
15 Q     Again, the assumption -- well, we know that
16 this letter was provided to Mr. Coulter at his
17 request, correct?  He said can you send me the
18 letters and you sent this letter to him?
19 A     Yes.
20 Q     And by this letter, I'm referring to P-5,
21 which is the July 20th, 2016 letter; is that
22 accurate?
23 A     Yes.
24 Q     Do you know why he asked you to send him

57

1  this letter?
2  A     I was supposed to send him anything I got.
3  It wasn't this letter in particular.
4  Q     So I believe we testified earlier, is it
5  fair to say that the July 20th, 2016 letter
6  identified in P-5 had no bearing on your intent to
7  pay the debt?
8  A     Rephrase.
9  Q     All right.  I will rephrase.  You weren't
10 going to pay the Capital One debt before you
11 received the July 20th, 2016 letter?
12 A     Correct.
13 Q     Is that correct?
14 A     Correct.
15 Q     You weren't going to pay it after you
16 received the July 20th, 2016 letter that's marked as
17 P-5, correct?
18 A     Correct.
19 Q     So this letter had no impact on you, other
20 than give you a basis to bring a lawsuit; is that
21 correct?
22 A     I don't think that's correct.
23 Q     Explain to me what other purpose this
24 letter served.  Would you agree that it certainly

**58**

1  didn't impact on your desire to pay this debt?
2  A    My desire to not pay the debt was after the
3  information obtained from Coulter Credit.
4  Q    That was before you received this July,
5  2016 letter?
6  A    Well, I didn't have any clue of that before
7  this. This letter is how we came upon the agreement
8  that it will hurt me, rather than help me.
9  Q    So you're saying that when he reviewed your
10  credit report -- I understand what you're saying.
11  Okay. I do understand what you're saying. But just
12  to get back to this, that this letter did not impact
13  on your intent to pay your debt; is that correct?
14  A    The letter, it did impact, because we
15  didn't know of what was going on until we received
16  this letter, and that --
17  Q    Okay.
18  A    And we decided that if we were to do
19  anything with this, this will hurt me, rather than
20  help me, even though it wasn't expressed here.
21  Q    You already testified, I want to make sure
22  we're clear, you already testified before you
23  received this letter, you weren't going to pay this
24  debt, correct?

**59**

1  A    When I first received the letter, I didn't
2  have the means to pay it.
3  Q    But you looked at a credit report, you saw
4  that the debt was on there. You didn't pay it?
5  A    Yes, absolutely.
6  Q    When you got the Capital One charge-off
7  statement, you didn't pay it?
8  A    I didn't receive it.
9  Q    You didn't receive it. Okay.
10  A    That's the exhibit, whatever --
11  Q    I'm going to have it marked.
12  A    P-4, right?
13  Q    No, no. I'm talking about the Capital One
14  -- you know what --
15         MR. SCHWARTZ:  We'll make it
16  easy. Let's get this marked P-6.
17         (Document marked as Exhibit P-6
18  is marked for identification.)
19  BY MR. SCHWARTZ:
20  Q    I've handed you P-6, which is the Capital
21  One charge-off statement for your credit card. And
22  it was, it has a due date on it, I'm just looking
23  for a mail date, based on habit, the due date of
24  April 19, 2014; is that correct?

**60**

1  A    Um --
2  Q    It's in the box at the top, in the red box?
3  A    Yes, I see it.
4  Q    I'm looking at a black and white, so I'm
5  trying to figure it out. Okay. At that time, and
6  the address here -- it's Reneisha L. Branch,
7  correct?
8  A    Uh-huh.
9  Q    The address is 916 North 63rd Street,
10  Philadelphia, PA?
11  A    Yes.
12  Q    Was that your mailing address to the best
13  you can remember, in or around April of 2014?
14  A    It was probably with them, yes, but I was
15  removed from the property by then.
16  Q    But nonetheless, this was a charge-off
17  statement. It provided a balance of $925.90,
18  correct?
19  A    Uh-huh -- yes.
20  Q    And so from April -- you made no payment as
21  a result of this?
22  A    Well, I didn't receive it.
23  Q    You were aware you had a credit card debt
24  with Capital One, correct?

**61**

1  A    Yes.
2  Q    And you were aware that you didn't pay that
3  debt as agreed, correct?
4  A    Yes.
5  Q    And you would agree with me that that debt
6  lapsed in 2014?
7  A    Yes.
8  Q    And from 2014 until July 20th, 2016, you
9  made no effort to pay that debt?
10  A    Well, yes.
11  Q    And from July, 2016, until today, you
12  haven't paid that debt?
13  A    No.
14  Q    Do you believe you don't owe this debt?
15  A    The balance, I believe, is incorrect.
16  Q    Tell me what's incorrect about it. What do
17  you think is incorrect?
18  A    The card was only a — I'm trying to
19  remember back then. I believe it was a limit of
20  $500. I'm not sure if it says on here. Yes, I had
21  a limit. Yes, there you go, credit limit of $500.
22  Q    So you believe that if you used that credit
23  limit to the maximum, they couldn't charge you more
24  for interest or anything along those lines, late

Page 66

1  that?
2  A    I do.
3  Q    Do you know what statutory damages are
4  available under the FDCPA to you?
5       MR. ZEMEL:  Just to be clear,
6       the witness seems to be a little unclear,
7       do you mean a dollar amount?
8       MR. SCHWARTZ:  A dollar amount.
9  BY MR. SCHWARTZ:
10 Q    Whether she knows what the cap is under the
11 FDCPA?
12 A    I do not.
13 Q    If I represented to you that the most you
14 can recover under the FDCPA for statutory damages is
15 $1000, does that sound correct?  Are you aware of
16 that, that the cap on statutory damages, the maximum
17 recovery is $1000?
18 A    Okay, now I am.
19 Q    You weren't aware of that prior to the
20 filing of this complaint or any other complaint in
21 this action?
22 A    No.
23 Q    So what you're seeking for yourself are
24 statutory damages, the most that you could recover

Page 67

1  would be $1000.  Would that be an accurate
2  statement?
3  A    Well, it's not just for myself.  I'm
4  representing a class of people.
5  Q    Do you believe that by representing a class
6  of people, you would be entitled to recover anymore
7  than $1000 for yourself?
8  A    I don't believe anything, because I just
9  found out that you said the cap was $1000.
10 Q    I don't want you to take my word.  Bear
11 with me for one second.
12      (Brief pause.)
13 BY MR. SCHWARTZ:
14 Q    If I find it, I find it.  Okay.  So take a
15 look at P-7, which is your Original Complaint.
16 Okay?
17 A    Yes.
18 Q    Do you understand that you're not seeking
19 any kind of actual damages for harm?
20 A    Yes.
21 Q    Do you recall prior to July 13th, 2017, the
22 date this complaint was filed, do you recall
23 reviewing the contents of this complaint with your
24 attorney?

Page 68

1  A    Yes.
2  Q    And do you believe that the content of this
3  complaint is accurate?
4  A    Yes.
5       MR. SCHWARTZ:  Let's mark this
6       as P-8.
7       (Document marked as Exhibit P-8
8       is marked for identification.)
9       (Discussion off the record.)
10 BY MR. SCHWARTZ:
11 Q    The reporter has handed you what's
12 identified as the First Amended Complaint, which was
13 filed on August 14th, 2017.  Do you have that in
14 front of you?
15 A    I do.
16 Q    Have you had an opportunity to review that?
17 A    Yes.
18 Q    Okay.  Do you understand the class that
19 you're representing in this case?
20 A    Yes.
21 Q    Okay.  What would that class, what is your
22 understanding of who you are representing?
23 A    So I'm going to say that it's the
24 individuals that received this letter from the

Page 69

1  creditor of Capital One.
2  Q    Is that for nationally, state, county, Zip
3  code, do you know who the group of people that you
4  represented?
5       MR. ZEMEL:  And I'm just going
6       to object.  We haven't moved for class
7       serve and we haven't made our definitive
8       decision in the motion.
9  BY MR. SCHWARTZ:
10 Q    I'm basing this in your complaint.  I
11 understand, and to remain consistent, so I can
12 direct you to page seven of P-8, if you want to take
13 a look at that?  Okay.  So it's there in nice bold.
14      MR. ZEMEL:  Here.
15 BY MR. SCHWARTZ:
16 Q    After reviewing that, does that change the
17 scope of people that you're representing?
18 A    No.  It's still the individuals who
19 received the letter from Capital One.
20 Q    Now, again, in this, the First Amended
21 Complaint, if you turn to page 11 of the complaint,
22 again, for you personally, even for your class, as a
23 matter of fact, you're only seeking statutory
24 damages, correct?